**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ROBERT L. WILLIAMS,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:07-CV-0965-N (BH)** |
| | § | |
| **MICHAEL J. ASTRUE** | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred to the undersigned

United States Magistrate Judge for proposed findings of fact and recommendation for disposition.

Before the Court are the following:

(1)     *Plaintiff's Motion for Summary Judgment* ("Pl. Mot.") *and Plaintiff's Brief in Support of Motion for Summary Judgment* ("Pl. Br."), filed April 3, 2008;

(2)     *Commissioner's Motion for Summary Judgment* ("Def. Mot.") *and Defendant's Response to Brief in Support of Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment* ("Def. Br."), filed June 11, 2008; and

(3)     *Plaintiff's Reply Brief*, filed August 25, 2008.

Having reviewed the evidence of the parties in connection with the pleadings, the Court recommends

that the final decision of the Commissioner be **AFFIRMED**.

# I. BACKGROUND[1]

## A.      Procedural History

Robert L. Williams ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIB") under Title II and supplemental security income ("SSI") under Title XVI of the Social Security Act. Plaintiff protectively filed for DIB and SSI on February 19, 2004.[2] (Tr. at 92-95, 436-39). Plaintiff claimed he has been disabled since January 18, 2004, due to arthritis, carpal tunnel syndrome, a nervous condition, muscle spasms, flat feet, an injured finger, and a back injury. (Tr. at 92, 102). Plaintiff's application was denied initially and upon reconsideration. (Tr. at 31-49, 53-57). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 58). A hearing, at which Plaintiff personally appeared and testified, was held on September 16, 2005. (Tr. at 454-97). On November 18, 2005, the ALJ issued his decision finding Plaintiff not disabled. (Tr. at 17-24). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 5-7). Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 5). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on May 31, 2007.

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

[2] Plaintiff previously submitted DIB applications on March 15 and October 7, 2002. (Tr. at 86-91). These applications were denied initially and Plaintiff did not request reconsideration. (*See* Tr. at 31-42). The allegations of disability in these prior applications relate to the instant application for DIB. (*See e.g*, Tr. at 102, 192).

**B.** **Factual History**

    **1.** **Age, Education, and Work Experience**

Plaintiff was born on December 25, 1954. (Tr. at 21). At the time of the hearing before the ALJ he was 50 years old. *Id*. He completed the ninth grade. (Tr. at 21, 458). His past relevant work experience includes work as an indoor and outdoor lighting installer, fiber optic cable installer, and apartment maintenance worker. (Tr. at 486). Plaintiff last worked in January of 2004. (Tr. at 95).

    **2.** **Medical Evidence**

In October of 1989, Plaintiff went to Dr. Don Cheatum, M.D., complaining of a work-related neck and lower back injury that occurred on June 19, 1989. (Tr. at 213). Shortly thereafter, Dr. Cheatum referred Plaintiff to Dr. Gary Tunell, M.D., who issued a report on December 4, 1989. (Tr. at 213). Dr. Tunell determined that Plaintiff was beginning to develop carpal tunnel syndrome with sympathetic dystrophy and preliminarily started Plaintiff on physical therapy. Dr. Cheatum prescribed aggressive physical therapy with Dr. Evangeline Cayton, M.D., along with the prescription drug Elavil for chronic pain syndrome and for treatment of fibromyalgia. (Tr. at 215). Dr. Cayton administered physical therapy, which included a program of moist heat, massage, electrical stimulation, and active neck and lower back exercises between November 29, 1989, and April 18, 1990. (Tr. at 206). During this time period, Dr. Cayton noted that Plaintiff missed many of his appointments and his neck and lower back had ranges of motion within functional limits. (Tr. at 204).

On May 31, 2001, Dr. Robert D. Wilcox, M.D., successfully performed surgery for a crush injury to the fifth finger on Plaintiff's left hand. (Tr. at 202). At two follow-up appointments on

June 7 and 28, 2001, Dr. Wilcox reported Plaintiff's condition as "All OK" (Tr. at 201). On August 2, 2001, Dr. Wilcox determined that a callus was forming on Plaintiff's finger and recommended that Plaintiff wear a splint to alleviate stiffness. (Tr. at 199).

Plaintiff moved to Denver, Colorado, in August of 2001, and was treated by Dr. Sachar at Concentra Stapleton Medical Center. (Tr. at 270). Dr. Sachar performed surgery on Plaintiff's left hand fifth finger on October 21, 2001, but Plaintiff's condition did not improve. *Id*. Dr. Sachar advised Plaintiff that he could either learn to live with the pain or try a flexor tenolysis.[3] Dr. Sachar performed the flexor tenolysis of the finger and palm on January 9, 2002. After this second surgery, Plaintiff returned to physical therapy from January 11 to January 30, 2002, but "was discharged because according to the therapist's note, [he] was resistant to treatment and noncompliant". (Tr. at 270). On January 14, 2002, Dr. Sachar offered Plaintiff a third surgery, which he refused. *Id*. Dr. Sachar therefore recommended a continuation of physical therapy. *Id*.

On March 19, 2004, Plaintiff received an MRI of the lumbar spine under the direction of Dr. Muhammad A. Nasir, M.D.. (Tr. at 364-65). Dr. Ying Zhao, M.D., the radiologist who read the MRI, determined that Plaintiff had a mild degenerative change including mild spondylosis[4] and posterior disc protrusion with regard to his cervical spine and minimal disc desiccation to his lumbar spine. *Id*. Dr. Zhao also noted that here was no evidence of spinal cord or spinal canal compromise. *Id*.

On May 11, 2004, Dr. Kenneth Wright, M.D., conducted a consultative medical examination

---

[3] Tenolysis is a surgical procedure to free a tendon from surrounding adhesions. A flexor is any muscle serving to bend a body part, such as a finger or limb. Medical Dictionary, United States National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Aug. 25, 2008).

[4] Spondylosis refers to any of various degenerative diseases of the spine. Medical Dictionary, United States National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Aug. 25, 2008).

as part of Plaintiff's disability development. (Tr. at 192). During the examination, Dr. Wright noted that Plaintiff "was unable to cooperate and what history he provided was idiosyncratic and incoherent." (Tr. at 192). Dr. Wright also noted that Plaintiff was "an agitated man constantly crying out in pain with[out] any contact or change in position." (Tr. at 193). Plaintiff did not permit Dr. Wright to examine the passive range of motion in his neck, joints, upper extremities, or cervical spine. (Tr. at 193-94). Plaintiff also did not attempt toe, heel, or tandem walking, although Dr. Wright noted that Plaintiff could get on and off the examination table without assistance. (Tr. at 194). Dr. Wright also observed that Plaintiff's fine and dextrous finger control was intact. *Id*. Dr. Wright's clinical impression was that it was impossible to accurately evaluate Plaintiff's physical symptoms because he was not a helpful historian and resisted physical examination. *Id*. He also found that "many of [Plaintiff's] physical symptoms apparently have not changed since his initial injury at 22 years old." (Tr. at 194) (referring to when Plaintiff fell out of a truck, *see* Tr. at 292-93, 298-300). Dr. Wright further noted that many of Plaintiff's complaints were nearly identical to those he complained of in 1989. (Tr. at 194). Dr. Wright found no striking physical findings but concluded that Plaintiff's back pain might limit some daily activities, such as putting on socks. (Tr. at 195).

On April 22, 2004, Plaintiff re-established contact with Dr. Wilcox. (Tr. at 423). Dr. Wilcox determined that Plaintiff's small left finger was unusable and suggested amputation. (Tr. at 424).

On June 21, 2004, Dr. Robert Key, M.D., evaluated Plaintiff's flat feet. (Tr. at 356). Dr. Key diagnosed Plaintiff with mild to moderate flat fee and hallus valgus.[5] Dr. Key noted that

---

[5] Hallus valgus is an abnormal deviation of the big toe away from the midline of the body or toward the other toes of the foot that is associated with the wearing of ill-fitting shoes. Medical Dictionary, United States National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Aug. 25, 2008).

"whereas [the feet] are somewhat flat, [they] do appear to be functionally adequate. I do not know why he holds his left 3rd toe in extension. Nor why his symptoms are so severe." (Tr. at 357).

On July 9, 2004, Plaintiff visited Parkland Health and Hospital System, complaining of a tingling along his right side and numbness along his right arm, face and leg. (Tr. at 393). He was diagnosed with Transient Ischemic Attack[6] by Dr. Kathy Rinnert, M.D. Plaintiff was admitted to Parkland with a bed and orders to stay, but refused to do so. *Id*.

On July 20, 2004, Dr. Gregg Diamond, M.D., performed an electrodiagnostic of Plaintiff's left arm. (Tr. at 377-79). The results of the test were consistent with moderate to severe carpal tunnel syndrome but showed no evidence of denervation. (Tr. at 378). The test results also indicated ulnar sensory neuropathy but showed no evidence of radiculopathy. *Id*. An MRI of the left finger performed by Dr. Albert Tesoriero, M.D., at the request of Dr. Diamond was normal. (Tr. at 376). Based on these test results, Dr. Wilcox prescribed wrist and elbow splints along with Celebrex. (Tr. at 420). On September 30, 2004, Dr. Wilcox injected the long and ring trigger fingers to attempt to alleviate Plaintiff's pain. (Tr. at 417). On December 6, 2004, Dr. Wilcox performed a decompressive neuroplasty of the left median and ulnar nerves of the wrist in an attempt to alleviate Plaintiff's carpal tunnel syndrome. (Tr. at 414).

On October 7, 2004, Plaintiff visited Parkland Health and Hospital System with a complaint of back pain and was diagnosed with lumbar spondylosis. (Tr. at 384-85).

On May 5, 2005, Plaintiff again visited Dr. Wilcox, who determined that Plaintiff's symptoms had returned in totality and that he still showed signs of nerve compression. (Tr. at 405).

---

[6] A transient ischemic attack, also called a mini-stroke, is a brief episode of cerebral ischemia that is usually characterized by temporary blurring of vision, slurring of speech, numbness, paralysis, or syncope and that is often predictive of a serious stroke. Medical Dictionary, United States National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Aug. 25, 2008).

At the request of Dr. Wilcox, Dr. Diamond examined Plaintiff on August 22, 2005, and found that he was a "robust, physically fit black male in no apparent distress." (Tr. at 427). Dr. Diamond diagnosed Plaintiff with "mild median sensory neuropathy across the left wrist with marked improvement in motor study compared to presurgical condition." (Tr. at 429). There was also evidence of slight ulnar sensory neuropathy at the left wrist and ulnar motor and sensory neuropathy across the left elbow. *Id*. There was no evidence of denervation. *Id*.

### 3. Hearing Testimony

A hearing was held before the ALJ on September 16, 2005. (Tr. at 454). The hearing was attended by Plaintiff, his attorney and a vocational expert ("VE"). *Id*.

#### a. *Plaintiff's Testimony*

Plaintiff testified he was born on December 25, 1954, completed ninth grade, and had no children under the age of eighteen. (Tr. at 458). He confirmed that he could read and write in English, lived in a house, and had a driver's license, but sometimes could not drive due to pain. (Tr. at 458-59). Plaintiff stated that he had been unable to work and had not been employed since January 18, 2004. (Tr. at 459).

Plaintiff testified that he had problems walking due to flat feet and hallus valgus. (Tr. at 460). He classified his foot pain level as ranging from five to eight on a scale of ten seventy percent of the time, and stated that his feet hurt at the highest level six days per week. (Tr. at 460-62). The only treatments he used were "Carisel," foot massages, and an orthopedic shoe. He also walked with a cane that was not prescribed by a doctor. *Id*. Plaintiff also stated that he had back pain, and that most of the pain was located in his lower back, but radiated throughout his entire body. (Tr. at 463). For this pain, Plaintiff took amitriptyline, Etodolac, ibuprofen, and Celebrex daily. (Tr. at 464).

Plaintiff testified that the pain in his lower back rated from five to nine on a scale of ten. (Tr. at 476).

Plaintiff further testified that carpal tunnel syndrome affected his left wrist and that a release had been performed, but he continued to have shooting, needle, and numbness pain as before. (Tr. at 465). As a result, he dropped items from his left hand such as coffee mugs. (Tr. at 466). Plaintiff also wore a "wrist thing" most of the time, but took it off occasionally to let his wrist breathe. *Id*. Plaintiff testified that he had an average level of pain in his wrist of seven or eight on a scale of ten, but on a good day may have a level of five. *Id*. The medication taken by Plaintiff for wrist pain was the same as that for his back pain. (Tr. at 465-66). Plaintiff stated that he visited with doctors in August, July, and May of 2005, regarding his wrist and he visited Parkland Hospital twice regarding his feet. (Tr. at 468-69).

Plaintiff testified that he injured the small finger on his left hand on May 31, 2001, while pulling two-inch fiberoptic underground cable at work. (Tr. at 474, 484). He had four surgeries on his finger, but none restored the use of his finger. (Tr. at 474-75). Plaintiff's left hand was limited in use, and he could not pick up anything beyond a pencil or coffee cup. (Tr. at 475).

Plaintiff estimated that he could carry twenty to thirty pounds and stand for approximately twenty to thirty minutes. (Tr. at 470). After more than twenty to thirty minutes of sitting, he testified that he had to get up and move around. (Tr. at 470). Additionally, Plaintiff testified that he could not walk more than a city block before stopping. *Id*. Plaintiff could endure twenty minutes of walking at one time. (Tr. at 477). With breaks, Plaintiff testified that he could be on his feet no more than two hours per day. (Tr. at 478). He could not perform the exercises that were prescribed by the doctor because he could not maintain his balance. (Tr. at 471). He performed small

household tasks such as helping his wife with cooking, dishes, laundry, vacuuming, sweeping, mopping, and occasionally grocery and clothing shopping. (Tr. at 471). However, Plaintiff could not perform these chores three to four days per week. (Tr. at 482). Pain made driving difficult. (Tr. at 481). Plaintiff also could mow his lawn, but it typically took him all day to do so due to the pain in his lower back. (Tr. at 479).

In an average day, Plaintiff slept about six hours per night and six hours throughout the rest of the day to avoid pain. (Tr. at 472-73, 482). He could perform basic hygiene such as brushing his teeth and showering, but he could not shave because of the pain. (Tr. at 472). Occasionally, Plaintiff had issues dressing himself and his wife tied his shoes for him. (Tr. at 480). Throughout the day, Plaintiff typically watched the news, sat in his garage, and walked to his mother's house. (Tr. at 473).

### b. *Vocational Expert*

Molly Meloy testified as the VE at the hearing. She testified that Plaintiff previously worked from 1995 until 1998 as an indoor and outdoor lighting installer, which qualified under the heavy to very heavy exertional category and at a semiskilled vocational preparation level. *Id*. Plaintiff also worked as a fiberoptic installer in 2000 and 2001, which fell under a heavy to very heavy exertional category and also at the semiskilled specific vocational preparation level. *Id*. Finally, the VE testified that Plaintiff was doing some apartment maintenance from 2003 to part of 2004, which fell under the heavy exertional category and at the semiskilled specific vocational preparation level. *Id*. Overall, the VE specified that Plaintiff performed work at the heavy to very heavy semiskilled specific vocational preparation level. (Tr. at 487).

The ALJ then posed a series of hypothetical situations to the VE. *Id*. The first hypothetical

entailed an individual with the same age, education and work experience as Plaintiff, who could lift ten pounds frequently and thirty pounds occasionally, stand and walk six hours, sit for six hours, who was limited in his ability to push and pull with the left upper extremity, and who was limited in reaching with the left upper extremity. *Id*. The VE testified that such a person could not perform Plaintiff's past relevant work. *Id*. However, the VE testified that the person could work as a parking lot attendant, for which there are 14,388 jobs in the regional level and 135,644 jobs at the national level. (Tr. at 488). Additionally, the person could work as a courier or messenger, for which there are 10,435 jobs at the regional level and 157,066 jobs at the national level. *Id*. Finally, the person could also perform as an information clerk, for which there are 5,041 jobs at the regional level and 70,657 jobs at the national level. *Id*.

In the next hypothetical, the ALJ modified the hypothetical and added that the person could sit or stand at will; occasionally climb, balance, and work around ladders, scaffolds and ropes; crouch, kneel, crawl, and stoop. (Tr. at 489). The VE testified that the job of information clerk would still suit such a person, along with a general office clerk, for which there are 2,035 jobs at the regional level and 166,622 jobs at the national level. (Tr. at 490). Furthermore, the person could work as light, unskilled truck or delivery driver, for which there are 19,182 jobs at the regional level and 99,993 jobs at the national level. *Id*.

In the third hypothetical, the ALJ proposed a person at the same age, education, and work experience as Plaintiff, who could lift ten pounds frequently and thirty pounds occasionally, but who was limited to standing and walking only two hours and sitting for only six hours, alternating sitting and standing at will, who could occasionally push and pull with the left upper extremity, but who had limited reaching with left upper extremity. (Tr. at 491). The VE testified that none of Plaintiff's

past work could be performed under such circumstances. *Id*. The VE also classified this work level at the sedentary level due to the standing and walking limitation. *Id*. The VE testified that such a person could perform as a pen and pencil telephone solicitor, for which there are 13,672 jobs at the regional level and 124,283 jobs at the national level. (Tr. at 493). Second, the person could perform as a surveillance monitor, for which there are 5,289 jobs at the regional level and 117,648 jobs at the national level. *Id*. Third, the person could function as a sedentary, unskilled general office clerk, for which there are 4,376 jobs in the regional economy and 60,590 jobs in the national economy. (Tr. at 493-94). The use of a cane would not interfere with such a person's job capabilities. (Tr. at 494).

Next, Plaintiff's attorney questioned the VE. (Tr. at 495). Plaintiff's attorney added to the third hypothetical "occasional handling with the non-dominant hand and the occasional fingering with the non dominant hand." *Id*. The VE testified that those conditions would have a "significant and perhaps a devastating impact" on the jobs of telephone solicitor, surveillance monitor, and general office clerk. *Id*.

## C.    <u>ALJ's Findings</u>

The ALJ denied Plaintiff's application for benefits in a written opinion issued on November 18, 2005. (Tr. at 17-24). Using the five-step process required by 20 C.F.R. §§ 404.1520 and 416.920, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. at 18; Tr. at 23, ¶2). After reviewing the medical transcript, the ALJ concluded that Plaintiff had the severe impairments of degenerative disc disease, carpal tunnel syndrome, and status post left fifth finger fracture. (Tr. at 18; Tr. at 23, ¶3). Although these impairments were "severe" within the meaning of the Regulations, they were not severe enough to

meet or medically equal, either singly or in combination, a listed impairment. (Tr. at 18; Tr. at 23, ¶4).

The ALJ then considered Plaintiff's symptoms (including pain), objective medical evidence, and medical opinions to evaluate Plaintiff's residual functional capacity ("RFC"). (Tr. at 19). The ALJ gave less weight to the Disability Determination Service's medical assessments dated June 14 and December 9, 2004, because the opinions were not based upon examinations, but rather, on information in the record at the time of the assessments. (Tr. at 19-20). The ALJ found that Plaintiff's statements regarding the intensity, persistence, or functionally limiting effects of pain were not entirely credible and that he "presents himself as being much worse than that which is contained in the record." (Tr. at 20; Tr. at 23, ¶5). The ALJ determined that Plaintiff had the RFC to: lift/carry 10 pounds frequently and thirty pounds occasionally; stand/walk six hours in an eight hour day; sit for about six hours in an eight hour day; push/pull occasionally and/or reach with his non-dominant left upper extremity; and occasionally climb ladders/ropes/scaffolds, balance, crouch, crawl, kneel, and stoop. (Tr. at 21; Tr. at 23, ¶6). However, Plaintiff could only work in positions that would allow him to sit or stand at will. *Id*. The ALJ found Plaintiff incapable of performing any of his past relevant work. (Tr. at 21; Tr at 23, ¶7).

Having determined that Plaintiff could not return to his previous work, the ALJ considered whether Plaintiff could perform other jobs existing in significant numbers in the national economy. (Tr. at 21). The ALJ classified Plaintiff as an "individual closely approaching advanced age" with a limited high school education and no transferable skills from any past relevant work. (Tr. at 21; Tr. at 23, ¶¶8-10). The ALJ then determined that Plaintiff retained the RFC to perform a significant range of light or sedentary work. (Tr. at 21-22; Tr. at 23, ¶11). Examples of jobs that Plaintiff could

perform were information clerk (with 5,041 jobs in Texas and 70,657 in the national economy), general office clerk (with 2,035 jobs in Texas and 166,622 in the national economy) and truck driver (with 19,182 jobs in Texas and 99,993 in the national economy). (Tr. at 22; Tr. at 24, ¶12). Accordingly, the ALJ determined that Plaintiff was not under any disability, as defined in the Social Security Act, at any time through the date of his decision. (Tr. at 22; Tr. at 24, ¶13).

## II. ANALYSIS

### A. <u>Legal Standards</u>

#### 1. **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759

F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      Issues for Review**

Plaintiff presents the following issues for review:

(1)      The decision erred in determining Plaintiff's residual functional capacity; and

(2)      The substantial evidence does not support the Commissioner's determination that Plaintiff can perform other work in the national economy.

(Pl. Br. at 1).

**C.      Issue One: Residual Functional Capacity**

Plaintiff argues that substantial evidence does not support the ALJ's determination of his RFC. (Pl. Br. at 6-7). Specifically, Plaintiff contends the ALJ erred because he did not discuss reasons for finding Plaintiff not credible and he did not include a narrative discussion of the

reasoning of behind the RFC assessment. *Id.*

Social Security regulations provide for the ALJ to assess a claimant's RFC before proceeding from step three to step four of the sequential analysis that determines whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). When assessing a claimant's physical abilities, the ALJ first assesses the nature and extent of the physical limitations and then determines the RFC. 20 C.F.R. § 404.1545(b). "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Id.* "RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting." *Id.* at *2 (emphasis in the original). The RFC is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988).

### 1. Credibility

Plaintiff contends that ALJ erred in the credibility assessment because he did not explicitly consider the seven factors set forth in SSR 96-7p. (Pl. Br. at 8-9) (emphasis in original).

Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*,

27 F.3d 164 n.18 (5th Cir. 1994). Nevertheless, the ALJ's "determination or decision [regarding credibility] must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). To shed light on an individual's credibility, Social Security regulations provide a non-exclusive list of the following seven relevant factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." (*Id.* at *3).

The ALJ stated that he considered the medical evidence in accordance with SSR 96-7p. (Tr. at 19). Plaintiff does not specify which of SSR 96-7p's seven factors the ALJ failed to consider. Nor does Plaintiff cite any case law holding that the failure to consider all seven factors constitutes reversible error or that these factors must be explicitly addressed. (*See* Pl. Br. at 7-10). The Fifth Circuit has not specifically addressed whether an ALJ is required to consider all seven of the factors listed in SSR 96-7p.[7] It has, however, explicitly rejected the requirement that an ALJ "follow

---

[7] In a case where a claimant appealed a denial of benefits based on the ALJ's failure to apply two out of the seven factors, the court affirmed the decision of the ALJ and found the omission to be harmless. *Nall v. Barnhart*, 78 Fed.Appx. 996, 998 (5th Cir. 2003) ("The ALJ applied five of the seven listed factors in his analysis. Any failure to apply the remaining two constitutes harmless error as Nall has not alleged that they apply to his condition.") In another case, the claimant appealed based on the fact that the ALJ did not explore each of the seven factors; the court, however, affirmed the ALJ's decision and found that the record indicated that the seven factors had been

formalistic rules" when assessing a claimant's subjective complaints of pain. *Falco*, 27 F.3d at 164. Other courts that have considered the issue have found that an ALJ is not required to expressly address all seven factors listed in SSR 96-7p. *Cross v. Comm'r of Soc. Security*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) ("[t]he ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence"); *Blom v. Barnhart*, 363 F.Supp.2d 1041, 1055 (E.D. Wis. 2005) ("[w]hile SSR 96-7p does not require the ALJ to analyze and elaborate on each of these seven factors when making a credibility determination, the ALJ must sufficiently articulate her assessment of the evidence"). *Compare Canales v. Barnhart*, 308 F.Supp.2d 523, 527-28 (E.D. Pa. 2004) (finding a lack of substantial evidence because (1) the ALJ only examined one of the seven factors; (2) medical evidence supported the claimant's limitations; and (3) the ALJ did not pose hypothetical questions to the VE). In light of these cases, and consistent with the Fifth Circuit's rejection of the requirement that an ALJ "follow formalistic rules," the Court finds that the ALJ was not required to separately evaluate each of the seven factors identified by SSR 96-7p. Any requirement to consider all factors of a non-exclusive, illustrative list would impose a formalistic rule on an area in which ALJs are given great deference. *See Carrier*, 944 F.2d at 247; *see Falco*, 27 F.3d at 164.

Additionally, the testimony at the administrative hearing explored most of the factors identified in SSR 96-7p. (Tr. at 456-82). In addressing the first factor, the Plaintiff testified that he performed small household tasks such as helping his wife with cooking, dishes, laundry, vacuuming, sweeping, mopping, and occasionally grocery and clothing shopping. (Tr. at 471). In regard to the

---

implicitly considered. *Espinoza v. Barnhart*, 66 Fed. Appx. 524, 2003 WL 21017084 (5th Cir. 2003) ("Although the decision of the ALJ does not explore each of the seven factors listed in SSR 96-7p, the record demonstrates that the ALJ considered those factors").

second factor, Plaintiff testified that he had carpal tunnel syndrome in his left wrist and had a release performed, but still had shooting, needle and numbness pain. (Tr. at 236, 465). As for the third factor, Plaintiff testified that grasping things and walking precipitated or aggravated symptoms. (Tr. at 460, 465). Addressing the fourth factor, Plaintiff testified that he took amitriptyline, Etodolac, ibuprofen, and Celebrex daily. (Tr. at 464). In regard to the fifth factor, Plaintiff wears a "wrist thing" most of the time, presumably referring to the splint prescribed by Dr. Wilcox. (Tr. at 466; *see* Tr. at 420). Plaintiff also testified that he wore orthopedic shoe and used a cane. (Tr. at 462,465). Looking at the sixth factor, Plaintiff stated that he used "Carisel" and a foot massager. (Tr. at 462). Factor seven, the catch-all provision, was the only factor from SSR 96-7p not explored at the administrative hearing.

Finally, at least one examining doctor explicitly referenced by the ALJ cast doubt on Plaintiff's credibility with regards to his pain. During his consultative examination, Dr. Wright noted Plaintiff "had a painful response to touch almost anywhere and his loud outcries during attempted examination lacked spontaneity and appear completely out of proportion to the stimulus." (Tr. at 19, 195).

Based on the medical evidence and Plaintiff's testimony, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints about his limitations were not completely credible. *Leggett*, 67 F.3d at 564; *see* Tr. at 23, ¶5.

## 2. Narrative Discussion in RFC

Plaintiff also argues that the summary of the medical evidence provided by the ALJ does not include a narrative discussion to explain his RFC assessment as required by SSR 96-8p. (Pl. Br. at 10-11). He further contends that the lack of a narrative discussion means that the RFC assessment

does not properly account for his manipulative limitations or limitations on his ability to stand. (Pl. Br. at 10-11).

Social Security Ruling 96-8p provides that the RFC assessment is a function-by-function assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. 1996 WL 374184, at *1, 3. RFC involves both exertional and nonexertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id*. at *5. The RFC assessment "considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments." 1996 WL 374184, *1. "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." *Id*. Although SSR 96-8p requires a function-by-function analysis, if the record reflects the ALJ applied the appropriate standard and considered all the evidence in the record, there is no error. *Rodriguez v. Comm'r of Social Sec. Admin.*, 2008 WL 1958985, at *11 (N.D. Tex. Apr. 29, 2008) (Ramirez, Mag. J.); *see Porter v. Barnhart*, 200 Fed. Appx. 317 (5th Cir. 2006) (unpublished) (finding compliance with SSR 96-8p when the ALJ considers the record as a whole).

With regards to the manipulative limitations, the physical RFC assessment typically includes an evaluation of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. 20 C.F.R. § 404.1545(b). The physical RFC assessment also determines how "other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id*.

Plaintiff implies that the ALJ's failure to include limitations on Plaintiff's ability to grasp, handle, and finger means that the ALJ did not consider manipulative limitations, but this implication is not supported by the RFC assessment. The ALJ found that Plaintiff could only occasionally reach with his left hand. (Tr. at 23, ¶6). Since "reach" is not listed as one of the seven strength demands but is listed as an example of a manipulative function, it is clear that the ALJ *did* impose manipulative limitations on Plaintiff's RFC. Plaintiff assertion that the ALJ's summary of the medical evidence failed to account for manipulative limitations is therefore without merit.

As for Plaintiff's alleged inability to stand for more than two hours in an eight-hour work day, he presented no medical evidence, other than his own assertions, that he could not stand for six hours. Although Plaintiff was diagnosed with flat feet and hallus valgus, no exertional limitations accompanied this diagnosis. (Tr. at 356-57). Since Plaintiff did not meet his burden to show a limited or restricted ability to stand, the ALJ properly considered Plaintiff to have no limitation or restriction with respect to that functional capacity. SSR 96-8p, 1996 WL 374184, *1.

The transcript of the hearing and the ALJ's decision shows that he applied the appropriate standard and considered all the evidence in the record. (Tr. at 18-20, 460-67). The ALJ's failure to cite specific medical evidence for his conclusions therefore was not error. *Rodriguez*, 2008 WL 1958985, at *11; *Porter*, 200 Fed. Appx. 317.

In sum, the Court finds that substantial evidence supports the ALJ's RFC assessment. *Leggett*, 67 F.3d at 564. The ALJ did not err in his credibility assessment or in the consideration of the medical evidence, and remand is not warranted on this point of error.

D.    **Issue Two: Ability to Perform Other Work**

The second issue for review raised by Plaintiff is that the ALJ did not met his burden at step

5 to show that Plaintiff could perform other work. (Pl. Br. at 11-13). Plaintiff argues that the testimony of the vocational expert is insufficient because he would be unable to perform any of the jobs proposed by the VE with either the limitations determined by the ALJ or the additional limitations proposed by Plaintiff's attorney. (Pl. Br. at 12). Plaintiff concludes that this leads to a lack of substantial evidence for the Commissioner's proof that other jobs exist. (*See* Pl. Br. at 12-13).

When determining that a claimant can perform other work, the ALJ may rely on the Medical-Vocational Guidelines or, if limitations make the Medical-Vocational Guidelines inapplicable, the ALJ must rely upon the testimony of a VE or other similar evidence. *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000). A VE relies on the Dictionary of Occupational Titles ("DOT") in order to testify regarding skills needed and availability of specific jobs. However, the DOT "is not comprehensive, in that it cannot and does not purport to include each and every specific skill or qualification for a particular job." *Id.* "[A]ll kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation." *Id.* at 146. Therefore, the VE must interpret the DOT and make adjustments to fit a particular claimant. Accordingly, the ALJ must rely upon the VE to make adjustments to the availability of jobs based on a particular claimant's skills and abilities.

In this case, the ALJ determined that Plaintiff was able to perform work activities at the light exertional level and considered the limitations imposed upon Plaintiff. (Tr. at 22). Essentially, Plaintiff argues that he cannot perform the three jobs listed at step 5 because he is limited to occasional reaching. This argument fails for two reasons. First, it assumes that Plaintiff is limited to occasional reaching in both of his upper extremities, whereas the ALJ only imposed this

restriction on his non-dominant upper left extremity. (Tr. at 23, ¶6). Plaintiff presented no evidence that his upper right extremity suffers from similar limitations. Second, Plaintiff's argument completely disregards the VE's interpretation of the DOT. At the administrative hearing, the hypothetical questions incorporated the limitation of occasional reaching. (Tr. at 488). The VE considered this restriction as it pertained to information clerks and testified that "there would be a slight five percent reduction on these jobs with regards to the occasional pushing, pulling, and reaching with the left upper extremity, non-dominant." (Tr. at 489). This five percent reduction also applied when the ALJ imposed a sit/stand at will restriction on the RFC. (Tr. at 490). The VE also applied a twenty-five percent reduction to the number of light, unskilled driver positions with a sit/stand restriction. *Id.* Thus, it is clear from the transcript that the VE considered all of Plaintiff's limitations and adjusted the availability of jobs accordingly.

Having determined that the ALJ properly relied upon the adjusted number of available jobs, the Court next considers whether the number of jobs supports the ALJ's step 5 finding. "Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 C.F.R. § 416.966(b). Jobs that are isolated and exist in only very limited numbers in relatively few locations outside of the region where a claimant lived would not qualify under this test. *Id.* Although no set number establishes what constitutes "significant" for purposes of step 5, the Northern District of Texas has found 3,750 jobs in Texas in the most limited classification (unskilled sedentary) to be a significant number of jobs.[8] *Hollan v. Apfel*, 2001 WL 180151, at *8 (Feb. 20, 2001) (Sanderson, J.) (citing Sixth, Eighth, Ninth, and Tenth Circuit case

---

[8]  The opinion in page 8 of *Hollan* refers to the total number of jobs as 37,500. However, page 7 of the opinion says 3,750. It appears from the context of the case that 3,750 is correct.

law).  Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding.  *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

In this case the amount of jobs that are available, even after reductions, still amount to a significant number.  No reduction applied to the 2,035 general office clerk positions Plaintiff could perform.  The number of jobs available in the information clerk position at the light exertion level, when reduced by five percent, is roughly 4,788 jobs in the region.  (*See* Tr. at 490).  The number of jobs available in the driver position at the light exertion level, when reduced by twenty-five percent, is roughly 14,386 in the region.  (*See* Tr. at 490).  Together, the number of jobs in the regional economy in these three positions amounts to 21,209.  Considering that the ALJ did not impose a sedentary restriction, this number far exceeds the 3,750 job threshold necessary to show a significant number at the sedentary level since jobs at both the light and sedentary exertion levels are available to Plaintiff.  *See Hollan*, 2001 WL 180151 at *8; *see* Tr. at 493 (listing telephone operators, surveillance system monitors, and a reduced number of general office clerks as unskilled sedentary jobs Plaintiff could perform).  The ALJ therefore met his burden at step 5 to show that Plaintiff was capable of performing other work.  *Greenspan*, 38 F.3d at 236.  Plaintiff presented no evidence to rebut this finding, and the Court therefore concludes that substantial evidence supports the ALJ's step 5 finding.  *Id.*

## III.    RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**.

**SO RECOMMENDED**, on this 26th day of August, 2008.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE